## THE PEERLESS.

### HORAN v. HUGHES et al.

(District Court, S. D. New York. March 5, 1921.)

1. **Shipping ⬳54—Charterer, exercising reasonable care in selecting bargeman, not liable for his negligence.**

In a libel against the charterer of a barge for its loss while being towed by a tug, where libelant paid the bargeman, but according to usual practice bargeman was selected by charterer, charterer having exercised reasonable care in making the selection, was not liable to libelant for bargeman's negligence.

2. **Towage ⬳15(2)—Evidence held not to establish that tug was negligent in making up barges.**

In a libel against a tug for loss of one of the barges towed, evidence *held* not to establish that the tug was negligent in the make-up of the barges.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Towage** ⟨key⟩**15(2)—Evidence held not to establish that tug was negligent in giving orders to bargemen or seeing that same were carried out.**

In a libel against a tug for loss of a barge towed, due to a failure to lengthen the hawsers, where the tug gave a signal to bargemen to lengthen their hawsers, and all of them did so except bargeman on lost barge, evidence *held* not to show that tug was negligent in giving orders to bargemen, or seeing they were carried out.

In Admiralty. Libel by Thomas J. Horan against James Hughes, Jr., in personam, and the tug Peerless, in rem. Libel dismissed. Decree affirmed 282 Fed. 1004.

This is a libel against the respondent Hughes, in personam, and the tug Peerless, in rem, for the loss of the coal barge Catherine Horan on October 23 and 24, 1917. At the time the tug was under charter to the respondent James Hughes, Jr., and was being towed from Boston to New York by the Peerless. The libel against the charterer is prima facie upon the mere loss of the barge. The charterer brought in the tug, upon the theory that it was through her negligence that the loss occurred.

The libelant chartered the tug to Hughes on January 1, 1916, with a bargeman on board whose wages he undertook to pay. It proved, however, inconvenient and difficult for the libelant to pay the bargeman wherever she happened to be, and the practice grew up of having the charterer pay the wages and send the account to the libelant, who would pay by check.

On July 2, 1917, after the barge had been under charter for 18 months, this arrangement was recognized in writing, and continued until the time of the accident. In some cases the charterer did not require a check from the libelant, but charged his account with the bargeman's wages, though this is not altogether clear. Furthermore, bargemen repeatedly were being changed, and it was frequently the custom of the charterer to replace them when they left or were discharged for misconduct. This was done with the knowledge of the libelant and with his approval.

There was an issue of fact upon the trial whether, in the case of the bargeman on board at the time of the accident, this had occurred, and whether the charter, as he said, had called up the libelant and got his consent to the employment of the new bargeman just before the east-bound voyage. However that may be, the charterer in fact employed the bargeman Murray, who was on board on the day in question, and who had never been seen by the libelant. The barge left Newtown creek loaded with coal for Boston some time before the accident, reached Boston safely, was discharged, and started back in company with two other coal barges in charge of the tug Peerless.

On leaving Boston, Hallowell, the master of the Peerless, told all his bargemen to run on half hawser as long as they could up to the entrance of the Cape Cod Canal, stating as his reason that by so doing it would be easier to make the Cape Cod breakwater. He left to the bargeman, however, the right to use their discretion to slack off the hawser, if necessary, as proved not to be the case. Through the Cape Cod Canal the vessels were hauled close together on spring lines, and this continued after they emerged and through Buzzard's Bay. At about 10 o'clock that night the wind began to blow too strong from the east for the safety of the flotilla, close-hauled as it was, and the tug gave an order of one long and one short blast, which is the signal to lengthen out.

At this time the flotilla was rigged as follows: A towing hawser leading from a bridle on the bow of the foremost boat, about 150 fathoms long, was bent around the stern bitts of the tug. All three barges end on end were close-hauled together. Two hawsers, 90 or 100 fathoms long, had been furnished to the second and third barges, by which to tail on to the barge ahead, and it was the purpose of the tug by the signal to have the full length used. The second barge did slack off the full length of her hawser; one eye being placed over the port bitt of the first barge and led to the midships bitt of the second barge. The eye of the third barge's hawser was placed about the port or starboard bitt

---

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of the second barge, but whether the full length of the hawser was let out or not does not certainly appear; the bargeman of the third barge, Murray, having disappeared. The case was tried by both sides on the assumption that only half of this hawser was ever let out.

It is the custom in such cases, when the hawsers have been let out, for the bargemen, beginning at the rear of the tow, to blow four blasts on a horn, and this signal is relayed to the tug, who thereupon starts towing again at full speed. In this case the tug did get four blasts from the first barge, and at once got under way. The wind continued to rise, and blew at about 20 miles an hour, raising some sea. At some time not definitely stated, the third barge was seen, broken loose and drifting before the wind. Nothing could be done to help her, and she eventually went ashore and became a total loss.

The libelant complains of the tug in failing to see that her orders to the barge to lengthen out her hawsers were carried out, and in having no bridle by which the flotilla could tow from the midships stern of one barge to the midships bow of the other, thus letting the barges drag askew. He complains of the charterer on the ground that, so far as the loss arose from the negligence of the bargeman, he was the agent of the charterer and not of himself.

William F. Purdy, of New York City, for libelant.
Herbert Green, of New York City, for charterer.
Stephen R. Jones, of Boston, Mass., for the Peerless.

LEARNED HAND, District Judge (after stating the facts as above). [1] First, as to the dispute between the libelant and the charterer: Mr. Purdy does not question under the charter that the bargeman was the agent of the libelant when originally hired. I think it equally plain that the substituted bargemen, including Murray, who was on board when the accident happened, were also the agents of the owner. It is true that the charterer chose him, but he chose him with the consent of the libelant, and in accordance with a practice of some standing whenever an occasion arose, and it is quite clear that no other system was possible, considering how transitory is the employment of these men, and the fact that they might leave wherever a barge happened to be. Unless the charterer had the right to substitute a bargeman, his use of the barge would be much limited. This the libelant recognized, and clearly consented to substitution at the choice of the charterer, by continuing to pay the wages of those so chosen.

In this view the charterer's duties extended to no more than reasonable care in the selection of a competent man, and there is no just ground to challenge the selection of the charterer in this particular case. Individually, neither the libelant nor the charterer is at fault for the fault of Murray, but, as Murray was in law the agent of the libelant, his fault is by law charged against him. Therefore the charterer appears to me to have made a good excuse for his failure to return the barge, and against him I dismiss the libel.

[2] Two faults are charged against the tugs: First, in the make-up of the barges; and, second, in failing to ascertain that Murray had done his duty in lengthening out the whole of his hawser. I shall assume that the barge broke loose because the hawser was too short. There is no certain evidence of this, but the case has been so treated, and I think Horan's evidence is sufficient, who saw upon the stranded barge a substantial part of the cable still coiled. Unfortunately, Murray has disappeared and his testimony does not help on this issue.

The first question is whether the make-up of the tow contributed to cast away the barge. There was considerable testimony on the trial of the desirability of having stern bridles upon the sterns of the first and second barges, so that the lead should be from midships to the midships forward bitt of the following barge. But there is no proof whatever that this is a universal or even a general custom in making up tows, and, although conceivably it is a better practice, I fail to see how it would lessen the strain upon the connecting hawsers. So far as I can see, all that it would do would be to drag the barges somewhat askew. But that does not seem to have contributed to the accident here. It is clear that any improvised bridle such as was suggested by some of the witnesses would be much worse than none, and I agree with those witnesses who say that, even when the barges are light, it would be likely to result in chafing through the hawsers.

[3] The case against the tug, therefore, resolves itself into the care which she used to see that the hawser was lengthened. It was universally assumed by all the witnesses that the hawser should have been put out to its full length. Hallowell had given contrary orders between Boston and the Cape Cod breakwater, but he expressly limited his directions to that part of the voyage, and gave his reasons, which did not obtain beyond the Cape Cod Canal. It seems to me, therefore, that when the order came to lengthen hawsers, beyond Buzzards Bay, Murray had no reason to suppose that the previous order remained in force, and every reason to suppose that it did not. Common nautical knowledge should have told him that he must lengthen out the whole hawser, which apparently he failed to do. Whether this was because he was lazy and found it more convenient to use the old length, or whether he misunderstood Hallowell's order, of course no one knows, but it makes no difference. The bargeman of the second barge made no mistake, and did not misconceive the order to use the whole of his hawser, and, although there was greater strain upon it, he rode through safely. I think, therefore, that the tug was not at fault for failing to give proper orders.

The last question is whether the tug used sufficient care to see that her orders had been carried out. The customary way is to accept the signal of the forward barge, relayed, as it should be, from the stern barges, and this the tug did. The fault charged against her is that she did not observe the failure of the rear barge to conform. Looking aft from the pilot house of the tug, her master could see only a group or cluster of seven lights tailing in his wake. Two of these were on the first barge, two on the second, and three in the third. I accept the statement of the master and of the deckhand that it was impossible to tell how far away from the middle barge the three rear lights were. It was raining and dark, and those lights were nearly half a mile away. There was no opportunity for any perspective under those circumstances, and the tug, having got the proper relay answer, had the right to assume that all had been properly done.

But it is argued that the tug, having a searchlight, did not use it. There is no evidence as to how far the searchlight would carry, except the fact that the floating barge was subsequently picked up by it. One

expert witness, Milliken, said that, if he had had a searchlight, he should certainly have used it, and that he thought it was the proper thing to do; but neither he nor anyone else could say whether this light would have carried back far enough to see whether the third barge had lengthened her hawser. Moreover, to see it at all, the tug would have had to change her helm, as her smokestack stood in the way of the searchlight, if she was dead ahead of her tow.

I think the charge is too speculative to be the basis of fault. In the first place, it seems to me within the limits of proper care by the tug that she should have relied upon the answer which she got. She had a right to assume that in so simple a duty as lengthening out of the hawsers the bargemen had done their duty. I will not say it would not have been an added caution to use such other means as she had to make assurance doubly sure, but I cannot think that it was necessary. But it is not necessary to rest the case on this. We do not know whether the searchlight would have shown anything more than the towing lights themselves. That depends entirely upon what its range was, and how far in the night it would have disclosed the position of the third barge. That necessarily rests wholly in speculation, and as the burden is upon the libelant to make out a case against the tug, I think she fails.

Finally, I am not quite clear as to what the tug could have done, had she found out that the barge had not followed orders. She clearly could not have left the barges without motive power. All she could have done was again to give her order to lengthen out. Whether this would have induced the bargeman to do his duty the second time is open at least to question. Possibly he would have understood it; possibly he would not. Certainly the loss resulted primarily from his failure to obey orders, and it seems to me merely supposition whether a repetition of the order would have had any different result. For these reasons, I think that the case against the tug has not been made out, and that the loss should fall upon the principal of the bargeman.

It results that the libel should be dismissed, with costs.